IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 16-cv-02935-RM-SKC

GORDON G. SAWYERS,

    *Plaintiff*,

    *v.*

BRIAN NORTON, in his individual and official capacities,
JONATHAN L. HART, in his individual and official capacities,
GARY BRUDER, in his individual and official capacities,
JESSE HAND, in his individual and official capacities,
DOES 1–10, in their individual and official capacities,

    *Defendants*.

---

**ORDER**

---

On December 2, 2015, Gordon G. Sawyers ripped his own right eyeball from its socket. He had been charged with arson and was in custody at the Rio Grande County Jail, where Defendants Hart, Hand, and Bruder were keeping watch and over which Defendant Norton presided as sheriff. Sawyers alleges that Defendants acted negligently and with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment. There is no question that Sawyers was mentally infirm and had been on suicide watch. But Defendants argue they adequately monitored him and are not liable as a matter of law. They move for summary judgment on all claims. The Court **GRANTS** in part and **DENIES** in part the motion.

**I.    BACKGROUND**

Taken in the light most favorable to Sawyers, the material facts are these. On November 17, 2015, Sawyers was arrested for having set fire to an art gallery under the belief that God had

1

told him to "cleanse the business of witches with fire." (SUMF ¶¶ 1–2.)¹ He was charged with a felony and booked into the Mineral County Jail, where he was initially assessed "to see if he was an imminent danger to himself, including suicidal risk or self harm." (*Id.* ¶ 4.) A counselor concluded:

> It is difficult to evaluate Mr. Sawyers mental status completely due to his grandiose and persecutory delusions and psychosis that interferes with his being able to exercise good judgment, understand reality as others do, and to behave appropriately. . . . [H]e did not display any aggressive behavior toward himself, me or others. He states that he has never been suicidal, even when he was depressed. . . . Although he clearly has mental health issues that I strongly suggest be treated while he is in custody, he denies any thoughts of harm to himself or others. Therefore referral for further evaluation would be questionable, as he does not appear to meet the criteria for commitment under Colorado law. I recommend that he continue to be evaluated while he is in custody, as he reports that he is not currently receiving treatment and it is likely that his delusions and behavior in reaction to his hallucinations may intensify.

(*Id.*)² Because Mineral County has few resources, Sawyers was transported to the Rio Grande County Jail (RGCJ) later that day to be held on his charges. (*Id.* ¶ 3.) Defendant Norton is the Rio Grande County Sheriff. Defendants Bruder, Hand, and Hart are law enforcement corrections officers at RGCJ.

When he got to RGCJ, Sawyers affirmed that he had never attempted suicide and did not have any suicidal thoughts, and he was assigned to general population housing. (*Id.* ¶¶ 5–6.) But Sawyers exhibited extreme behavior at RGCJ—including peeling back his toenails, causing other

---

¹ "SUMF" refers to the Statement of Undisputed Material Facts provided by the parties, as most recently filed with the movants' reply brief. (ECF No. 124-1.) For ease of reference, the Court will generally cite to SUMF, even when quoting or otherwise drawing from the factual support on which SUMF relies.

² Throughout his portion of SUMF, Sawyers suggests that certain facts proffered by Defendants are disputed because they do "not establish the absence of a genuine dispute as to Sawyers' [sic] capacity for self-harm." (*See, e.g.*, SUMF ¶¶ 4, 5, 9, 10, 12, 17, 21, 22, 23, 24, 25, 26, 27, 28, etc.) Of course, the Court is acutely aware of facts that show Sawyers's capacity for self-harm, such as the very incident that gives rise to this lawsuit. But these ubiquitously employed statements do not confront the facts supplied by Defendants, which merely demonstrate the content of certain psychological evaluations and other materials.

self-inflicted wounds, refusing meals, and refusing medication—and he was seen several times by mental health professionals during his stay. (*See, e.g.*, *id.* ¶¶ 53, 74.) On November 19, 2015, Sawyers was evaluated by a San Luis Valley Mental Health Group (SLVMH) clinician. (*Id.* ¶¶ 7–8, 15.) Sawyers denied symptoms of depression or anxiety, but the assessor diagnosed schizophrenia and recommended a psychiatric assessment and medication management. (*Id.* ¶¶ 5–6.) On November 21, jailers moved Sawyers to a lockdown cell for entering another inmate's cell and spitting because he believed God had told him to do so. (*Id.* ¶ 10.) He was moved back to general population, but on November 27 guards moved him to the booking/observation cell because he had been suffering from further delusions and found naked in another's cell attempting to put his penis into his own rectum. As Hart put it, "we had no choice ultimately but to place him in the holding cell because of his behavior." (*Id.* ¶ 12.) On November 27, 2015, at RGCJ's request, another SLVMH clinician returned to evaluate Sawyers, but Sawyers refused to talk. (*Id.* ¶ 16–18.) The report states, "ES kept client on suicide watch and advised the guards that if he has another psychotic episode to take client to the ER and call ES." (*Id.* ¶ 19.) Per Rio Grande Sheriff's Office policy, inmates who threaten to commit suicide will be placed in a holding cell and checked at least every fifteen minutes until cleared. If SLVMH gives an order for an inmate's safety, including putting him on suicide watch as happened here, jailers cannot change or clear that order. (*Id.* ¶ 61.) On November 28, SLVMH clinician Tammy Obie met with Sawyers, and her report recounts continued delusional behavior and notes that he had been belly cuffed by the jailers so that he would not harm himself but that he "adamantly denied [suicidal or homicidal ideations]." (*Id.* ¶ 20.) Obie's plan was that Sawyers would stay in the observation cell where he could be regularly monitored to ensure that he was not harming himself, but she concluded that he did not meet the criteria for invoking emergency procedures permitting the

3

courts or mental health professionals to take action when a person appears to be at risk of harming themselves. (*Id.* ¶¶ 21–25.) Finally, Obie told the jailers that she would request a psychological evaluation for November 30. (*Id.* ¶ 26.) On November 30, Sawyers was transported from RGCJ to SLVMH for another evaluation, but he again refused to cooperate with the psychiatric interview. (*Id.* ¶¶ 28–30.) The report from that day notes that Sawyers was not under a court order to obtain psychiatric treatment and could not be forced to sit for the interview or begin medications. (*Id.* ¶ 31.)

At some point on or before November 27, 2015, Sheriff Norton directed his deputies to document Sawyers's behavior in a log to assist SLVMH in assessing him. (*Id.* ¶ 14; Ex. 53, ECF No. 119-55, at 31, 33, 37, 43, 49.) Thus, while officers at RGCJ use personal logs that detail events throughout their shifts—such as when inmates are out for showers or lunch is served— they kept a log specific to Sawyers entitled "Suicide Watch-15 Min." (*See generally* Ex. 53.) Officers filled this log out on the computer in the booking area next to the cell in which Sawyers was located. (SUMF ¶ 63.) From 10:00 p.m. on November 27 through the end of November 30, this log details Sawyers's activity *ad nauseum*—whether his doings were mundane or noteworthy. (*See, e.g.*, Ex. 53, at 43 (containing nine straight entries from 3:00 a.m. to 5:15 a.m. of "lying on his matt" but also one at 8:10 am of "urinating in drinking cup").) December 1 is nearly empty, but the log continues with regular entries the morning of December 2. (*Id.* at 43.)

On December 2, 2015, Defendants Hart, Hand, and Bruder were on duty at RGCJ during the evening shift. (SUMF ¶ 33.) Hart and Hand were assigned to the booking desk area and were responsible for checking on Sawyers; Bruder was sitting in the sergeant's office around the corner and could see the booking area on a monitor. (*Id.* ¶¶ 33–34, 39.) The parties have provided photos of the booking area in relation to the cell in which Sawyers was held. (*See id.* ¶

4

35, Ex. 83.) Seated at the booking desk, an officer would be able to view portions of the cell. Standing at the desk, nearly every corner of the cell is visible. (*See id.*) The area also contains cabinets in which inmate medications are stored. Standing beside those cabinets, an officer can see the entire cell. (*See id.*) At some point during the evening shift, Hart stood at the medicine cabinets preparing medication to take to all of the inmates. (*Id.* ¶ 36.) Hart and Hand then left the area to distribute the same. (*Id.* ¶ 37.) Neither Hart nor Hand are sure exactly what time they left the booking area that night or how long they were away, but Hand testified that he usually performed this task at 9:00 p.m. and they were back within fifteen minutes. (*Id.* ¶¶ 37–38; Ex. 11, at 187:4–13.) In fact, Defendants are adamant that Sawyers was observed at least every fifteen minutes that day. (SUMF ¶ 50.) However, the "Suicide Watch" log has only ten entries from 2:15 p.m. to 9:45 p.m. and does not confirm any of Defendants' whereabouts or Sawyers's activity from 6:07 p.m. to 9:15 p.m.,[3] and there is no surviving surveillance video of the time in question. (*Id.* ¶ 37; Ex. 53, at 48.)

When they returned, Hart went to the cabinet to return the medication cups, Hand sat down at the booking desk, and the two spoke for a few minutes. (SUMF ¶ 39 (citing Bruder's testimony).) It is not clear who saw him first, but Hart or Hand noticed that Sawyers was turned away from them, had his hands on his face, and was bleeding. (*Id.* ¶¶ 40–41.) He claimed to have a bloody nose but refused to turn around. (*Id.* ¶¶ 42–43.) At around 9:15 p.m., the officers entered the cell and discovered that Sawyers had removed his right eye from its socket and was attempting to injure his left eye. (*Id.* ¶¶ 44–46.) They immediately restrained him to prevent further injury, and Bruder requested that dispatch page an ambulance. (*Id.* ¶¶ 48–49.) Sawyers

---

[3] The separate Hand/Bruder log for December 2 reads "meds prepped" at 7:40 p.m. (Ex. 53, at 46.) The logs also make clear that officers did not—contrary to Hand's testimony—prep medication at the same time every day (or even at or around 9:00 p.m. (*See, e.g.*, *id.* at 18 (6:58 p.m.), 24 (8:32 p.m.).)

5

vividly remembers removing his own eye to prevent it from being "harvested by the witches," but he doesn't recall anything else from earlier that day. (*Id.* ¶ 51.)

In addition to claims against Defendant in their individual capacities, Sawyers has alleged official-capacity claims against the Rio County Sheriff's Office that look to examine certain of its policies and practices. According to Norton, suicide is probably the leading cause of death in jails generally and mental health has become an issue in every county jail. (*Id.* ¶¶ 54–55.) The issue of mental health in the county jail has arisen before the Rio Grande county commissioners on several occasions—whether general policy was under discussion or a situation regarding a particular inmate—with Norton expressing budgetary, staffing, and practical concerns. (*Id.* ¶ 55; Exs. 15, 80, 81, 82, 84.) Norton's staff didn't participate in certain trainings available on reducing the number of people with mental illness in jails. (SUMF ¶ 59.) Even so, Norton testified loosely about training on suicide prevention, which included determining if someone is mentally ill or stressed, but the focus of his policy in mental health situations is best summarized as "call the professionals," such as those at SLVMH, and jail staff understood that if there were mental health concerns with a prisoner, they were to contact professionals for assistance and evaluation. (*Id.* ¶¶ 55, 60; Ex. C, at 73:21–75:4.) At the time of the incident, there were no formal medical and mental health policies or procedures manuals based on national accreditation standards of care in place at RGCJ. (SUMF ¶ 58.) However, the jail did have an attempted/suspected suicide policy which outlined procedures for notifying mental health professionals and fifteen-minute checks on inmates until they are cleared by those professionals. (Ex. 42.)[4]

---

[4] The policy does not require that every fifteen-minute check on a watched inmate be recorded. (SUMF ¶ 69.)

Norton has not been silent regarding the jail's role in housing mentally infirm patients. During Sawyers's incarceration, Norton vocally expressed antagonism to having him around. He spoke with Jennifer Silva (who in 2015 was the director of intensive services at SLVMH), expressing "an urgency to get [Sawyers] out of the jail . . . because he felt like he doesn't have the capacity to deal with [mentally ill] people in the jail." Norton testified that the unavailability of a facility that will receive mentally ill inmates like Sawyers makes it even more critical for deputies to be on top of their duties in caring for a mentally ill inmate. (SUMF ¶¶ 27, 56.) The state psychiatric hospital in Pueblo, Colorado is the only place to take a mentally ill inmate facing felony charges, but there is a wait of nine to twelve months to get an inmate transferred into its forensic unit. Judges cannot order the state hospital to accept inmates, so "the county jails get stuck with it, and there is nowhere to transport him except for the state hospital." (*Id.* ¶ 70.)

## II. ANALYSIS

Sawyers filed this action alleging negligence and deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment by Defendants in their individual capacities. He also alleged that the Rio Grande County Sheriff's Office, as a municipal institution, is liable based on its policy or custom of failing to provide medical care, failing to provide adequate training, and ratifying unconstitutional conduct of its employees. Defendants move for summary judgment on all claims.

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Barney v. Pulsipher*, 143 F.3d 1299, 1306–07 (10th Cir. 1998). The moving party does not have to negate the non-movant's claims in order to obtain summary judgment. *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). The movant only bears the initial burden of "'showing'—that is pointing out to the district

court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996).

**A. Claims Against Individual Defendants**

Under the Fourteenth Amendment's due process clause, pretrial detainees, like Sawyers, are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment. *Martin v. Bd. of Cty. Comm'rs of Cty. of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990); *see also Barrie v. Grand County*, 119 F.3d 862, 867 (10th Cir. 1997) ("The constitutional protection against deliberate indifference to a prisoner's serious medical needs, as announced in *Estelle v. Gamble*,[ ] applies to pretrial detainees through the due process clause of the Fourteenth Amendment.") (internal citation omitted). Therefore, Fourteenth Amendment protections extend to injuries caused by prison officials' "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). A claim of deliberate indifference includes both an objective and a subjective component. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The objective prong examines whether the prisoner's medical condition was "'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Id.* at 753. "The subjective prong examines the state of mind of the defendant, asking whether 'the official kn[e]w of and disregard[ed] an excessive risk to inmate health or safety.'" *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

8

Regarding the objective prong, the Tenth Circuit has defined a "*sufficiently serious medical need* as 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mata*, 427 F.3d at 753 (emphasis in original; quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). Defendants briefly intimate that Sawyers has failed to show his serious medical need because his condition "had not been diagnosed by a physician" and concluding that Sawyers's strange behaviors would not, to a lay person, seem to require the immediate action of a physician. (*See* ECF No. 103, at 5–6.) The Court disagrees. First, Sawyers was diagnosed with schizophrenia by two separate clinicians at SLVMH during his stay at RGCJ. Second, after bearing witness to Sawyers's repeated, strange, and self-harmful acts over the days leading up to the eye incident, Defendants did recognize the need for medical attention, enlisted SLVMH for further evaluation of Sawyers, and were beseeched by those same professionals to monitor him closely. Thus, the Court does not have to hypothesize as to whether a lay person would easily recognize the necessity for a doctor's attention because Defendants—themselves not medical professionals—recognized it.

The second, subjective prong is much trickier here. "[T]he responsible official must have a sufficiently culpable state of mind." *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1022 (10th Cir. 1996). Claims based on self-inflicted harm by an inmate are "considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody" and "a pre-trial detainee in a county jail, does not have a claim against his custodian for failure to provide adequate medical attention unless the custodian knows of the risk involved, and is 'deliberately indifferent' thereto." *Barrie*, 119 F.3d at 868–69. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited." *Whitley v.*

9

*Albers*, 475 U.S. 312, 319 (1986). "[C]laims sounding in negligence or medical malpractice" are not enough. *Sherman v. Klenke*, 653 F. App'x 580, 586 (10th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. at 838). "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at 105. With these principles in mind, the subjective mental state necessary for a viable claim is something akin to criminal recklessness:

> [A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. . . . [T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 836–37 (1994).

With these principles in mind, the Court considers whether any facts, taken in the light most favorable to Sawyers, could be employed by a reasonable fact-finder to find that Defendants consciously disregarded a substantial risk of harm. As an initial matter, there is nothing in the record that personally implicates Norton with a deliberately indifferent state of mind. He ensured that Sawyers was seen regularly by mental health professionals and instructed his subordinates to keep regular watch over him in accordance with the suicide policy. He also was not present at the jail at the time of the incident, and there are no facts to support any causal link between any action or inaction by him and the event itself. To the extent deliberate indifference claims are raised against Norton in his individual capacity, judgment in his favor is appropriate. However, the Court has more difficultly with Hand, Hart, and Bruder. Of course, all three have maintained that their collective watch over Sawyers never wavered to intervals longer the required fifteen minutes. There is very little evidence to the contrary, but there is some. After much pause, the Court finds that their failure to document their whereabouts for several hours

10

during the relevant time—especially when the logs reflect nauseatingly repetitive and attentive record-keeping at other times—permits a reasonable inference that they were not duly monitoring Sawyers as they should have been for up to several hours, a period long enough to permit the subsequent inference that they may have recklessly left unmonitored an inmate whom they had very good reason to believe could be a danger to himself. Moreover, contrary to their summary that medication usually goes out at 9:00 p.m., the Hand/Bruder log reflects that the medicine was prepped as early as 7:40 p.m. on the day in question and at varying times on other days. Moreover, the log entries from other days show up to two hours between medication prepping and distribution. There is too much factual deviance for the Court to be comfortable entering judgment in these officers' favor at this juncture.

Even so, Defendants argue that they are entitled to qualified immunity. After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a "heavy two-part burden." *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995); *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000); *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995). The plaintiff must first establish "that the defendant's actions violated a constitutional or statutory right." *Albright*, 51 F.3d at 1534; *see also Wilson v. Layne*, 526 U.S. 603, 609 (1999) (noting the court must first decide whether the plaintiff has alleged deprivation of a constitutional right). If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. *Albright*, 51 F.3d at 1534. In determining whether the right was "clearly established," the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether "the right [was] sufficiently clear that a reasonable officer would

understand that what he is doing violates that right." *Wilson*, 526 U.S. at 615 (internal quotation marks omitted).

In *Garcia v. Salt Lake Cty.*, the Tenth Circuit affirmed that "pretrial detainees are in any event entitled to . . . [protection] against deliberate indifference to their serious medical needs." 768 F.2d 303, 307 (10th Cir. 1985). In *Martin v. Board of County Commissioners of County of Pueblo*, the Tenth Circuit upheld the denial of qualified immunity because *Garcia* clearly established pretrial detainees share the same protection from deliberate indifference to serious medical needs as convicted inmates. 909 F.2d 402 (10th Cir. 1990). For the reasons discussed above, Sawyers has cleared his hurdle to show a possible constitutional violation by Hart, Hand, and Bruder—as inattention to an inmate such as Sawyers for several hours could be evidence of deliberate indifference. Thus, it is both clearly established by Tenth Circuit precedent that Sawyers is entitled to protection against deliberate indifference and factually possible that he was a victim of the same. Therefore, these officers are not entitled to summary judgment on qualified immunity grounds.

Finally, Colorado law makes plain that "[n]o public entity shall be liable for such actions except as provided in this article, and no public employee shall be liable for injuries arising out of an act or omission occurring during the performance of his or her duties and within the scope of his or her employment, unless such act or omission was willful and wanton." Colo. Rev. Stat. Ann. § 24-10-105. By its very nature, a negligence claim does not involve intentional or wanton conduct, and Defendants were clearly acting within the scope of their employment at all relevant times. Therefore, Sawyers's state law negligence claims—to the extent that they are brought against Defendants in their individual capacities—are not cognizable, and judgment in favor of Defendants on them is appropriate.

## B. Official Capacity Claims

Sawyers has also sued Defendants in their official capacities, which amounts to a claim against Rio Grande County itself. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."). "A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiffs." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). It may only be held liable under § 1983 "for its own unconstitutional or illegal policies." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir.1998). A plaintiff must therefore "identify 'a government's policy or custom' that caused the injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (quoting *Monell*, 436 U.S. at 691–92). The plaintiff must then show "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *duBois v. Payne Cty. Bd. of Cty. Comm'rs*, 543 F. App'x 841, 848–49 (10th Cir. 2013) (quoting *Monell*, 436 U.S. at 691–92). Deliberate indifference in the municipal liability context is an objective standard that

> may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." Although a single incident generally will not give rise to liability, "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." The official position must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a "direct causal link" between the action and the right violation. That is, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (citations omitted). Thus, it is not enough for a plaintiff to show that there were general deficiencies in a county's training program for jailers. Rather, he must identify a specific deficiency in the county's training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).

Here, Sawyers claims that Sheriff Norton adopted and carried out informal policies of denying appropriate medical care and protection, failed to adequately train the other officers in reacting to the mental health problems of inmates, and ratified their poor conduct by failing to conduct an investigation or make substantive changes to his policies. The Court does not find any of these accusations to be properly supported. There is no evidence of any informal or formal policy of denying healthcare. Quite to the contrary, Norton had an established policy and practice of using mental health professionals to evaluate inmates like Sawyers—and the record reflects that he was indeed evaluated several times and put under a close watch. At the time Sawyers was booked into RGCJ, pursuant to policy and practice, the booking officer filled out a medical questionnaire which included questions about suicide attempts or thoughts. Sawyers answered in the negative. There is further no evidence of shortcomings in the officers' training or any inappropriate ratification of their conduct by Norton. Sawyers does not identify any specific training measures not taken here that reasonably could be expected to prevent the type of harm that occurred. Moreover, while there may be some evidence that officers failed to perform their duty perfectly, which resulted in Sawyers removing his eye, any such failure is not the causal result of any policy or custom at the county or in the sheriff's office. The most favorable possible review of the record reflects only the temporary shortcomings of three officers on duty.

It does not reveal that some official policy, custom, or widespread practice was the moving force behind Sawyers's removal of his own eye. Even construing the record in the light most favorable to Sawyers, summary judgment is appropriate on all official capacity claims.

Finally, turning to the negligence claim against the county, the parties agree that sovereign immunity is waived by a public entity in an action for injuries resulting from the operation of a correctional facility. Colo. Rev. Stat. Ann. § 24-10-106(1)(b). The waiver of sovereign immunity created in section 24-10-106(1)(b) applies to "claimants who are incarcerated but not yet convicted of the crime for which such claimants are being incarcerated if such claimants can show injury due to negligence." *Hernandez v. City & Cty. of Denver*, 2018 COA 151, ¶ 7, 439 P.3d 57, 60, *cert. denied sub nom. Dodson v. Hernandez*, No. 18SC839, 2019 WL 1768380 (Colo. Apr. 22, 2019). However, Defendants suggest that this waiver does not extend to claims "where the act is the type of act for which the public employee would be or heretofore has been personally immune from liability." *Id.* § 24-10-106(2). They then argue that their recourse to qualified immunity cuts off county liability. However, as explained above, Bruder, Hart, and Hand are not entitled to qualified immunity at this juncture. Even though none of these officers can be personally liable for their own negligence, their employer may be, and the Court cannot grant summary judgment on these grounds.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 103) is **GRANTED** in part and **DENIED** in part. Claims of deliberate indifference to serious medical needs against Hart, Hand, and Bruder may proceed to trial, as may the official capacity negligence claims.

DATED this 31st day of May, 2019.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge